The BABCOCK & WILCOX COMPANY, Plaintiff–Appellant/Cross–Appellee,

v.

ARKWRIGHT–BOSTON MANUFACTURING MUTUAL INSURANCE CO.; St. Paul Mercury Insurance Co.; American Home Assurance Co.; American International Marine Agency; Allianz Insurance Co.; Insurance Co. of North America; Caryl Vaughn Gibbs, individually

and on behalf of certain underwriters of Lloyds of London; Indemnity Marine Assurance Co., Ltd.; English and American Insurance Co., Ltd.; Insurance Co. of North America (UK), Ltd.; C.A. Parr, Defendants–Appellees/Cross–Appellants,

Creole Insurance Co., Ltd., Defendant–Appellant/Cross-Appellee,

McDermott, Inc., Third–Party Defendant–Appellant/Cross–Appellee.

Nos. 93–4149, 93–4150.

United States Court of Appeals, Sixth Circuit.

Argued March 9, 1995.

Decided May 17, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 4, 1995.

Duke W. Thomas, Vorys, Sater, Seymour & Pease, Columbus, OH, David S. Cupps (briefed), Stephen J. Petras, Jr., Matthew J. Hatchadorian, K. Ellen Toth, Vorys, Sater, Seymour & Pease, Cleveland, OH, James E. Scheuermann (briefed), John M. Sylvester, Peter J. Kalis (argued), Kirkpatrick & Lockhart, Pittsburgh, PA, for Babcock & Wilcox Co. in No. 93–4149.

A. Thomas Kajander (briefed), Sharpe & Kajander, Houston, TX, Robert D. Archibald, McNeal, Schick, Archibald & Biro, Cleveland, OH, for Arkwright–Boston Mfg. Mut. Ins. Co., American Intern. Marine Agency, Allianz Ins. Co. and American Home Assur. Co.

William H. Baughman, Jr., Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, Thomas H. Crouch, Robert E. Salmon (argued and briefed), Stacy A. Broman, Meagher, Geer, Markham, Anderson, Adamson & Flaskamp, Minneapolis, MN, for St. Paul Mercury Ins. Co.

Thomas E. Betz, Gallagher, Sharp, Fulton & Norman, Cleveland, OH, Richard M. Shusterman, E. Douglas Sederholm (briefed), Barbara S. Zellner, White & Williams, Philadephia, PA, William J. Cleary, Mendes & Mount, New York, NY, for Insurance Co. of North America.

Nicholas J. Milanich, Jr., Reminger & Reminger, Cleveland, OH, Thomas J. Quinn, William J. Cleary, Mendes & Mount, New York, NY, for Caryl Gibbs.

Paul A. Rose (briefed), Brouse & McDowell, Akron, OH, C. Gordon Starling, Jr., Gerard T. Gelpi (briefed), Gelpi, Sullivan, Carroll & LaBorde, New Orleans, LA, for Creole Ins. Co., Ltd.

William J. Kraus, Kraus & Kraus, Cleveland, OH, Rockne L. Moseley (briefed), Janet M. Ahern, New Orleans, LA, for McDermott, Inc.

Duke W. Thomas, Vorys, Sater, Seymour & Pease, Columbus, OH, Matthew J. Hatchadorian, Vorys, Sater, Seymour & Pease, Cleveland, OH, James E. Scheuermann (briefed), John M. Sylvester, Peter J. Kalis (argued), Kirkpatrick & Lockhart, Pittsburgh, PA, for Babcock & Wilcox Co. in No. 93–4150.

Before: KENNEDY and NORRIS, Circuit Judges; TAYLOR, District Judge.[*]

KENNEDY, Circuit Judge.

Defendants, a group of insurance companies, subscribed to an insurance policy designed to provide excess liability insurance to plaintiff. Plaintiff filed this declaratory judgment action against defendants, seeking a judgment that its lower levels of insurance had been exhausted and that defendants were now liable under the excess insurance policy. The parties filed cross-motions for summary judgment, and the District Court granted summary judgment in favor of defendants. Plaintiff now appeals, and we affirm. Defendants have also filed a cross-appeal, but we find it unnecessary to reach that issue.

## I.

The Babcock & Wilcox Company ("Babcock") has manufactured boilers since the nineteenth century. Until 1972, Babcock approved the use of asbestos insulation, as well as various components containing asbestos, in its boilers. In 1972, Babcock ceased approving the use of asbestos insulation, although the use of certain asbestos-containing components continued until the mid 1980's.

In 1978, J. Ray McDermott & Company ("McDermott") acquired Babcock. Beginning in 1979, McDermott and Babcock jointly purchased excess umbrella liability insurance coverage. McDermott, with the help of its long-time broker Adams & Porter, drafted an insurance policy to satisfy McDermott's needs. After the two parties finalized the language and contents of the policy, Adams & Porter lined up several insurance companies to "subscribe" to the policy. These insurance companies (collectively, the "Subscribers") are defendants in the present action.

---

[*] The Honorable Anna Diggs Taylor, United States District Judge for the Eastern District of Michigan, sitting by designation.

The relevant portions of the policy provide as follows:

1. *COVERAGE*

Underwriters hereby agree, subject to the limitations, terms and conditions hereinafter mentioned, to pay on behalf of the Assured all sums which the Assured shall be obligated to pay by reason of their liability imposed upon the Assured by Federal, State, and Municipal or other qualified authority or in respect of liabilities assumed by the Assured under contract or agreement, for "property damage" and "personal injuries" as defined herein resulting from an "occurrence" as defined herein.

. . . .

### *DEFINITIONS*

. . . .

4. *OCCURRENCE*

The term "Occurrence," whenever used herein, shall mean any happening or series of happenings, arising out of or due to one event taking place during the term of this contract in respect to all the Assured's operations.

The dispute in the District Court centered around the definition of an "occurrence". This definition is the center of controversy due to the "buffer layer" established in the policy. All parties acknowledge that the Subscribers' policy does not come into play until the damages for each occurrence exceed a specified minimum amount.[1] The dispute, therefore, centers around how many "occurrences" have arisen under the 1979–80 policy.

The policy defines "occurrence", in part, as a "happening" that arises out of an "event." Babcock's primary argument before the District Court was that the relevant "event" is Babcock's decision to use asbestos in its boilers, and the "happening" or "series of happenings" are the injuries suffered by people exposed to the boilers. While the Subscribers do not take issue with Babcock's defini-

tion of "happening," they do strenuously argue that the "event" is not the decision to use asbestos-containing components, but rather is each person's exposure to the asbestos components.

The District Court did not resolve the "number of occurrences" issue. Instead, the lower court assumed that Babcock's definition of "event" was correct and focused on the last clause of the policy's definition of an "occurrence." That last clause states "arising out of or due to one event taking place during the term of this contract. . . ." After reviewing the record, the District Court concluded that Babcock had not carried its burden of showing that it made any pertinent decision during the term of the policy. Accordingly, the District Court granted summary judgment in favor of the Subscribers. Babcock now appeals.

### II.

### A. Trigger of Coverage

Babcock strenuously argues that the District Court erred in deciding the trigger of coverage issue, as it was not raised below and was not fully briefed. We disagree. We have reviewed the material submitted to the District Court in relation to the cross-motions for summary judgment, and the Subscribers clearly made this argument to the District Court. The argument was foreshadowed in early pleadings, and it explicitly appeared in the pleading entitled "Defendant Subscribers' Reply Memorandum in Opposition to Summary Judgment Motions of Babcock & Wilcox and McDermott." This pleading was filed with the District Court on March 5, 1993. A review of the lower court's docket sheet shows that Babcock filed at least one other relevant pleading after that date. On March 12, 1993, Babcock filed its "Reply by Plaintiff Babcock & Wilcox Co. in Opposition to Defendants' Cross Motion for Summary Judgment on Occurrence Issue and in Further Support of Plaintiffs' Partial Summary Judgment Motion." Thus, the

---

1. At some points, the parties state that this specified amount is $2 million, while at other times they indicate that the amount is $2.5 million. We need not resolve this dispute. If we find in favor of Babcock, the record clearly indicates

they have paid more than $2.5 million. If we find in favor of Subscribers, the record contains no evidence suggesting that the damages for any one "occurrence" (as the Subscribers define it) have amounted to $2 million.

Subscribers clearly placed the trigger of coverage issue before the District Court, and Babcock had at least one opportunity to respond to that argument. Accordingly, the District Court did not err in resting its decision on that ground.

Turning to a review of the merits of this issue, we start our examination, as did the District Court, with the assumption that Babcock's definition of "event" is correct—that Babcock's decision to use asbestos in its boilers is the relevant cause of the injuries. Babcock argues that this assumption should essentially end our inquiry, as the Subscribers have conceded that injuries did occur during the policy year. Babcock's argument misses two key points. First, it totally ignores the dispute over what must occur during the policy term—the injuries or the event. Second, it lifts the Subscribers' alleged "concession" completely out of context. As we noted above, both parties agree on the definition of "happening"—the dispute is over the definition of "event." The Subscribers' "concession" was made in conjunction with their contention that the relevant "event" was the exposure to asbestos.

■ We turn then to what must occur during the policy terms under Babcock's definition of event. The relevant portion of the policy states: "The term 'Occurrence' whenever used herein, shall mean any happening or series of happenings, arising out of or due to one event taking place during the term of this contract in respect to all the Assured's operations." The dispute revolves around the phrase "taking place during the term of this contract" and whether the phrase modifies "happening" or "event." Babcock argues that the policy requires the "happening or series of happenings" to occur during the policy term, as opposed to the "event."

■ The District Court correctly rejected this interpretation, and we adopt that portion of his opinion:

Such an interpretation requires the court to ignore the plain import of the sentence; it would have this court apply a phrase at the end of the sentence to a phrase at the beginning of the sentence without regard to any of the material

which lies between. Given the fact that the temporal restriction follows the term 'event' and is contained in an independent phrase separated from the description of happening by a comma, the plain meaning of the sentence is that the *event*, not the happening, must occur during the term of the contract.

During the oral argument on the motions, plaintiff argued that "there appears to be a comma missing".... With regard to the missing comma theory, the court must confine itself to the content of the document. This court can no more decide this case based on phantom punctuation than it could decide this case based on words and phrases not incorporated in the contract.

■ At various points in this appeal, Babcock has argued that the terms of the policy are ambiguous, and, therefore, this court should construe the language against the Subscribers. The Subscribers rebut this argument by pointing out that Babcock and its insurance broker selected the terms of the policy. We need not resolve this dispute. In Ohio, as in most states, a court reviewing an insurance policy must give all the words and phrases in the contract " 'their natural and commonly accepted meaning.' " *Tomlinson v. Skolnik*, 44 Ohio St.3d 11, 540 N.E.2d 716, 718 (1989)(quoting *Gomolka v. State Auto. Mut. Ins. Co.*, 70 Ohio St.2d 166, 436 N.E.2d 1347, 1348 (1982). The doctrine of construing the language against the insurance company does not come into play unless a clause is ambiguous. *King v. Nationwide Ins. Co.*, 35 Ohio St.3d 208, 519 N.E.2d 1380, 1384 (1988). As the District Court correctly concluded, the clause at issue in this case is not ambiguous. Once the "phantom comma" argument is rejected, the policy clearly requires that the "event" must take place during the policy term. That is the only reasonable reading of the clause.

After concluding that the relevant "event" must occur during the policy term, the District Court held that Babcock had not made the decision to use asbestos during that term. Anticipating that we might uphold the District Court on the first issue, Babcock contends that the District Court also erred with

respect to the latter conclusion. This brings us back to the definition of "event." For purposes of this issue, we are assuming that the relevant event is Babcock's decision to use asbestos in its boilers. Accordingly, we now turn to the issue of whether a "decision" occurred during the term of the policy.

■ The most obvious use of "decision" would be to describe an explicit decision by Babcock's executive officers or board of directors to continue using asbestos in the boilers. Babcock, however, has presented no evidence to show that it formally reconsidered its stance on asbestos during the term of the policy and decided to continue using it. Instead, Babcock has offered a number of theories as to what might constitute the relevant decision. The first is a "continuing decision" theory; that is, every time Babcock made or offered to make a boiler with the asbestos components, it remade the "decision". Babcock has also proffered a "continuing exposure" theory; that is, during the policy year, thousands of Babcock boilers containing asbestos were out in the marketplace. Babcock's decision to manufacture these boilers put workers in a situation where, during the policy year, they were exposed to asbestos. We agree with the District Court that these theories are not sufficient to establish that a decision took place during the policy term. In addition to being strained interpretations of a "decision," both of these arguments move away from Babcock's "one occurrence" scenario and start to sound remarkably like the Subscribers' "multiple occurrence" theory—each manufacture of a boiler or each exposure of a worker are separate "events" under the policy.

Finally, Babcock contends that even if they have not shown as a matter of law that a decision was made during the policy year, they have introduced sufficient evidence to create a triable issue of fact. We find no merit to this contention.

## B. Number of Occurrences

■ Although the District Court did not decide the number of occurrences issue, it was fully briefed below. We apply *de novo* review to a grant of summary judgment and may affirm a grant of summary judgment on grounds other than those used by the lower court. *See, e.g., Baggs v. Eagle–Picher Indus. Inc.*, 957 F.2d 268, 273 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 466, 121 L.Ed.2d 374 (1992). Consequently we have chosen to address the "number of occurrences" issue.

■ To reiterate, the policy defines "occurrence" as "any happening or series of happenings, arising out of or due to one event. taking place during the term of this contract. . . ." The parties essentially agree that, in the present context, the "happening or series of happenings" mentioned in the policy refers to the actual injury or disease suffered by a person exposed to the asbestos in Babcock's boilers. The parties, however, differ drastically in their definition of "event." According to Babcock, the "event" is Babcock's decision to use asbestos in its boilers. According to the Subscribers, the relevant "event" is each worker's exposure to the asbestos in the boilers. Thus, Babcock's definition of "event" would result in a finding of one occurrence. The Subscribers' definition, however, would result in many occurrences under the policy. Disputes over insurance policies are fundamentally contract disputes. As we discussed above, Ohio law requires that we look first to the language of the contract in trying to resolve the parties' dispute. We can go behind the face of the policy only if we determine that the controverted language is unclear or ambiguous.

The parties have directed our attention to a number of cases to assist us in construing the relevant language. Many of the cases cited by Babcock would superficially appear to support their position that only one occurrence exists. A closer look, however, reveals that the resolution of these cases turned on a definition of "occurrence" different from the one in the policy at issue. Of the cases cited by the parties, only three interpret definitions that are significantly similar to the one at bar. These are *Norfolk & Western Ry. Co. v. Accident & Casualty Ins. Co.*, 796 F.Supp. 929 (W.D.Va.1992), *aff'd. in part and dismissed in part as moot,* 41 F.3d 928 (4th Cir.1994); *Pittsburgh Corning Corp. v. Travelers Indemnity Co.,* No. 84–3985, 1988 WL

5302 (E.D. Pa. Jan. 21, 1988); and *Northern Shipping Co. v. Arkwright Boston Mfg. Mut. Ins. Co.*, 617 F.Supp. 136 (E.D. Pa.), *aff'd.*; 774 F.2d 1152 (3d Cir.1985).

Only one of these cases, *Pittsburgh Corning*, involved asbestos. Pittsburgh Corning manufactured a product known as Unibestos. The insurance policy defined "occurrence" as "one happening or a series of happenings arising out of or resulting from one event taking place during the term of this policy." Travelers argued that the cause of all injuries was Pittsburgh Corning's manufacture and sale of asbestos. The court rejected that argument, stating

> Pittsburgh Corning is being sued by thousands of claimants alleging exposure to Unibestos on hundreds of job sites, on thousands of different dates, and under a variety of conditions over a period of six years. Not everyone exposed to asbestos is affected and not all claimants were exposed under the same circumstances or to the same lot of asbestos. I hold that the 'cause' of the injuries in question is the exposure of each individual to asbestos. That exposure thus constitutes an occurrence for the purposes of determining the number of occurrences.

1988 WL 5302 at *2.

In *Norfolk & Western Railway*, the railroad brought an action against its excess insurer seeking to force the insurer to pay for claims arising out of noise-induced hearing loss. Again, the policy's definition of an "occurrence" is substantially the same as the definition in the policy at issue in this case. The railroad attempted to argue that only one "event" existed under the policy—the railroad's failure to protect its employees from excessive noise. The court rejected this argument, declaring:

> The difficulty that the court has with this argument is that it leads to a result which would defy common sense. The typical single occurrence giving rise to multiple claims is the automobile accident which gives rise to a chain of events which results in injury to several parties.... In this case, a wide variety of machines in a number of different locations created a variety of sounds over the course of a number of years. Railroad employees working near these machines suffered injury to their hearing as a result of exposure to these sounds.... While the railroad's negligence may indeed have been a cause of the injuries, calling that negligence the single occurrence out of which the claims arose is nonsensical.
>
> The railroad's argument allows the cause test to sweep too broadly and arrives at a result which defies common sense....

796 F.Supp. at 937. The court in *Northern Shipping* reached a similar conclusion, holding that the immediate cause of the injury was the relevant "event" for purposes of the policy, rather than a more remote cause. 617 F.Supp. at 138–39.

We find the reasoning of these three courts persuasive and agree with their result. Consequently, we reject Babcock's definition of "event." As Babcock relies exclusively on its proffered definition to support its theory for recovery, the District Court correctly granted summary judgment in favor of the Subscribers.[2]

## C. Failure to Warn

Creole Insurance Company, which provides an intermediate layer of excess insurance, was joined as an indispensable party to this action. After the District Court granted summary judgment in favor of the Subscribers, Creole filed a motion to alter or amend the judgment. In that motion, Creole argued that a relevant "event" had indeed occurred during the policy term, and that the event was Babcock's failure to warn its customers about the dangers of asbestos. The District Court denied Creole's motion, and Creole now appeals.

We need not address either the procedural posture or the merits of Creole's motion.

---

2. Babcock also argues that the District Court's conclusion leads to an absurd result because it creates a gap in coverage between the primary and excess layers of insurance. That result, however, is the logical one based on the language of the policy. The District Court did not "create" a gap. Rather, it simply recognized that the parties had drafted contract language that led to such a gap.

Even if Creole is right, that only affects our holding on the "trigger of coverage" issue. It leaves undisturbed our primary holding that the relevant "event" is exposure to as-bestos, not a more remote cause such as Babcock's decision to use asbestos or its failure to warn. Consequently, Creole's argument would not change the outcome of this suit, and we therefore decline to address it.

### D. Choice of Law

In the event we reversed the District Court, the Subscribers cross-appealed the District Court's choice of law decision. As we have affirmed the lower court, we need not reach this issue.

### III.

For the foregoing reasons, we **AFFIRM** the judgment of the District Court.