U.S. District Court
No. 2003-437

ENERGYNORTH NATURAL GAS, INC.

v.

UNDERWRITERS AT LLOYD'S

ENERGYNORTH NATURAL GAS, INC.

v.

UTICA MUTUAL INSURANCE COMPANY & a.

Argued: February 4, 2004
Opinion Issued: April 23, 2004

*McLane, Graf, Raulerson & Middleton, P.A.*, of Manchester (*Bruce W. Felmly & a.* on the brief, and *Mr. Felmly* orally), for the plaintiff.

*Wiggin & Nourie, P.A.*, of Manchester (*Doreen Connor* on the brief), and *Mendes & Mount, L.L.P.*, of New York, New York (*John G. McAndrews & a.* on the brief, and *Mr. McAndrews* orally), for defendant Underwriters at Lloyd's.

*Walker & Buchholz, P.A.*, of Manchester (*Kevin E. Buchholz* on the brief and orally), for defendant Utica Mutual Insurance Company.

*Morrison, Mahoney & Miller, L.L.P.*, of Boston, Massachusetts (*Michael F. Aylward* on the brief), and *Steptoe & Johnson, L.L.P.*, of Washington, D.C. (*Roger Warin* orally), for defendant St. Paul Fire and Marine Insurance Company.

*Devine, Millimet & Branch, P.A.*, of Manchester (*Eric Kane* on the brief), and *Siegal & Napierkowski*, of Cherry Hill, New Jersey (*Lawrence A. Serlin* on the brief and orally), for defendant Century Indemnity Company.

*McNeill, Taylor & Gallo, P.A.*, of Dover (*Stephen H. Roberts* on the brief), for the Complex Insurance Claims Litigation Association, as *amicus curiae.*

DUGGAN, J. The United States District Court for the District of New Hampshire (*McAuliffe*, J.) certified the following question of law, *see* SUP. CT. R. 34:

What "trigger-of-coverage" standard should be applied under New Hampshire law to determine the point at which an "accident" or "occurrence" causing "property damage" took place, within the meaning of the accident- and occurrence-based insurance policy provisions at issue, where an insured alleges

that: hazardous contaminants leaked and spilled onto the site over time, before 1952, and migrated through soil and groundwater, causing continuous injury to the pertinent property, from the time the leaks and spills occurred through the periods of coverage under the policies (1958-1983), which property damage was ordered by governmental agencies to be cleaned up in approximately 1996[?]

We adopt the district court's recitation of the facts. The plaintiff, EnergyNorth Natural Gas, Inc. (EnergyNorth), is the successor to companies that operated manufactured gas plants (MGPs) at sites in Laconia and Nashua. The plants began operating before 1900 and ceased MGP operations in 1952. In 1996, the New Hampshire Department of Environmental Services notified EnergyNorth of the existence of pollution damage at the MGP sites and required it to undertake investigative and remedial action, which resulted in EnergyNorth incurring substantial costs.

Underwriters at Lloyd's, Utica Mutual Insurance Company (Utica), St. Paul Fire and Marine Insurance Company (St. Paul) and Century Indemnity Company (Century Indemnity) issued the various comprehensive general liability (CGL) insurance policies in question. The policies became effective in 1958, and provided coverage until 1983. These policies insured against liabilities associated with property damage resulting from "occurrence(s)" or "accident(s)."

EnergyNorth brought a declaratory judgment action against the defendants in federal district court seeking indemnification for costs associated with investigating the pollution damage at the MGP sites and restoring the property. In its pleadings, EnergyNorth asserted that the pollution damage was predominantly caused by inadvertent leaks and spills during the years of MGP operations, particularly from underground gas holders and associated piping, and from unlined tar pits. EnergyNorth further asserted that the toxic wastes discharged into the environment continuously migrated through soil and groundwater at the sites, causing continuous discrete property damage as they moved. EnergyNorth argues that the continued migration of toxic wastes resulted in property damage due to "accident(s)" or "occurrence(s)" as those terms are used in the policies; therefore the defendants' CGL policies were triggered and provide coverage for the clean-up costs. The defendants argue that their respective CGL policies were not triggered.

The term "trigger" does not appear in the policy language, but rather describes "that which, under the specific terms of an insurance policy must

happen in the policy period in order for the potential of coverage to arise. The issue is largely one of timing—what must take place within the policy's effective dates for the potential of coverage to be 'triggered'?" *Montrose Chem. Corp. v. Admiral Ins. Co.*, 913 P.2d 878, 880-81 n.2 (Cal. 1995) (emphasis omitted). Determining the type of event that will trigger coverage under the particular language of a policy is the first step in assessing whether the policy provides coverage for the claim made against it. *See* Fischer, *Insurance Coverage for Mass Exposure Tort Claims: The Debate over the Appropriate Trigger Rule*, 45 DRAKE L. REV. 625, 631-32 (1997). This determination depends upon the language used in the policy and the relevant state law. *See CPC Intern. v. Northbrook Excess & Surplus Ins.*, 46 F.3d 1211, 1222 (1st Cir. 1995); Andrea, *Exposure, Manifestation of Loss, Injury-in-Fact, Continuous Trigger: The Insurance Coverage Quagmire*, 21 PEPP. L. REV. 813, 830 (1994).

Other jurisdictions have generally recognized four approaches to determine how coverage under an insurance policy is triggered: (1) manifestation; (2) injury-in-fact or actual damage; (3) exposure; and (4) continuous trigger. 23 E. HOLMES, APPLEMAN ON INSURANCE 2D § 145.3(B)(1), at 13-14 (2003).

Under a manifestation theory, "the date of loss is assigned to the policy period when property damage or actual damage is discovered, becomes known to the insured or a third party, or should have reasonably been discovered." *Id.* § 145.3(B)(2)(a), at 14. The injury-in-fact theory "implicates all of the policy periods during which the insured proves some injury or damage." *Id.* § 145.3(B)(2)(b), at 15. Under the exposure theory, "all insurance contracts in effect when property was exposed to hazardous waste would be triggered." *Id.* § 145.3(B)(2)(c), at 16. Finally, pursuant to the continuous trigger theory, "any policy on the risk at any time during the continuing loss is triggered[.]" *Id.* § 145.3(B)(2)(d), at 17.

In some situations, there is little practical difference between the particular theories utilized. For instance, "there is little practical difference between 'exposure' and 'injury-in-fact' in instances where contamination occurs almost immediately upon release." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 868 F. Supp. 1278, 1304 (D. Utah 1994), *aff'd*, 52 F.3d 1522 (10th Cir. 1995). Likewise, "[w]here the release or discharge of hazardous waste into the environment is identifiable, or even obvious, 'manifestation' occurs simultaneously with 'exposure' and 'injury.'" *Id.* Under the continuous trigger theory, however, it is assumed "without substantiation, that once property damage begins it always continues and that property damage results when property is first exposed to hazardous materials." HOLMES, *supra* § 145.3(B)(2)(d), at 17.

Thus, the continuous trigger theory "typically maximizes insurance coverage since all policies on the risk from the date of initial exposure through manifestation are triggered" regardless of proof of actual property damage during the policy period. *Id.*

Because the interpretation of the insurance policies in this case involves an unresolved issue of New Hampshire law, namely, what "trigger of coverage" theory applies, the district court certified the question to this court. In resolving this issue, we must look to the language of the policies in question. *See Quaker State Minit-Lube, Inc.*, 868 F. Supp. at 1303 (adopting a trigger-of-coverage theory that was "consistent with the pertinent policy language").

The interpretation of insurance policy language is a question of law for this court to decide. *Godbout v. Lloyd's Ins. Syndicates*, 150 N.H. 103, 105 (2003). We construe the language of an insurance policy as would a reasonable person in the position of the insured based upon a more than casual reading of the policy as a whole. *Id.* Policy terms are construed objectively, and where the terms of a policy are clear and unambiguous, we accord the language its natural and ordinary meaning. *Id.* We need not examine the parties' reasonable expectations of coverage when a policy is clear and unambiguous; absent ambiguity, our search for the parties' intent is limited to the words of the policy. *Id.* Where, however, the language of the policy reasonably may be interpreted more than one way and one interpretation favors coverage, an ambiguity exists in the policy that will be construed in favor of the insured and against the insurer. *High Country Assocs. v. N.H. Ins. Co.*, 139 N.H. 39, 41 (1994).

As a threshold matter, we must determine whether the policies are ambiguous. The fact that the parties may disagree on the interpretation of a term or clause in an insurance policy does not create an ambiguity. *Oliva v. Vermont Mut. Ins. Co.*, 150 N.H. 563, 566 (2004). In addition, policy provisions are not ambiguous merely because it is difficult to apply the factual situation to the specific policy language. *Id.* We will not create an ambiguity simply to construe the policy against the insurer. *Int'l. Surplus Lines Ins. Co. v. Mfgs. & Merchants Mut. Ins. Co.*, 140 N.H. 15, 20 (1995). We review each of the policies in turn.

*I. St. Paul and Utica Occurrence-Based Policies.*

First, we review three occurrence-based policies. The two policies issued by St. Paul were effective between 1978 and 1982. The policy issued by Utica was effective between 1974 and 1978. The pertinent policy language in one of the St. Paul policies and the Utica policy is as follows:

The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of:

Coverage A. bodily injury or

Coverage B. property damage

to which this insurance applies, caused by an occurrence . . . .

. . . .

"occurrence" means an accident, including continuous or repeated exposure to conditions which results in bodily injury or property damage neither expected nor intended from the standpoint of the Insured.

"property damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

The third policy, also issued by St. Paul, provides excess coverage and has slightly different wording. The pertinent policy language is as follows:

The Company will indemnify the Insured for all sums which the Insured shall become legally obligated to pay as damages . . . on account of:

1. Personal Injuries,
2. Property Damage,
3. Advertising Offense,

to which this Policy applies, caused by an occurrence.

. . . .

The term "Occurrence" means . . . with respect to property damage, an event, including injurious exposure to conditions, which results during this policy period in such personal injury, or property damage neither expected nor intended from the standpoint of the Insured.

"Property damage" is not defined in the St. Paul excess policy.

Several courts have reviewed policy language identical to that used by St. Paul and Utica. *See, e.g., Cessna Aircraft Co. v. Hartford Acc. & Indem. Co.*, 900 F. Supp. 1489, 1500-04 (D. Kan. 1995); *Quaker State Minit-Lube, Inc.*, 868 F. Supp. at 1294. In *Cessna Aircraft*, Cessna sought indemnity from various insurance companies for property damage and associated clean-up costs resulting from groundwater contamination

allegedly caused by improper disposal of hazardous materials. *Cessna Aircraft Co.*, 900 F. Supp. at 1493-95. In reviewing the pertinent policy language, the court held that the policies were unambiguous: "[p]roperty damage clearly must occur during the policy period." *Id.* at 1501. Accordingly, "coverage under these policies is 'triggered' by a showing that property damage occurred during the policy period." *Id.* at 1503. In reaching this conclusion, the court rejected the application of a manifestation theory, finding that "application of the 'injury-in-fact' trigger is more consistent with the language of the . . . policies." *Id.*

Similarly, in *Quaker State*, the court adopted the "injury-in-fact" trigger because it was "consistent with the pertinent policy language." *Quaker State Minit-Lube, Inc.*, 868 F. Supp. at 1303. The court noted, however, that when contamination is continuous, "the 'injury-in-fact' theory may also operate to trigger coverage on a continuous basis." *Id.* at 1302 n.38. Thus, the court concluded that, using an injury-in-fact trigger, an occurrence took place each time property damage was inflicted and that, where alleged contamination and property damage are continuing, "'injuries-in-fact' triggering coverage are also continuing." *Id.* at 1304.

The holdings in *Cessna Aircraft* and *Quaker State* are supported by the drafting history of the standardized CGL policy language. *See Montrose Chem. Corp.*, 913 P.2d at 890. We review this history because "the presence of standardized industry provisions and the availability of interpretative literature are of considerable assistance in determining coverage issues. Such interpretative materials have been widely cited and relied on in the relevant case law and authorities construing standardized insurance policy language." *Id.* at 891.

Most significant in the drafting history of the standardized insurance policy language is the change in language that was implemented in 1966. *Id.* Prior to 1966, third-party CGL policies covered damages caused by "accidents." *Id.* In 1966, however, the standardized form CGL policy was changed from being "accident-based" to "occurrence-based." *Id.* In making this change, "one of the drafters explained that in some exposure type cases involving cumulative injuries it is possible that more than one policy will afford coverage." *Id.* (emphasis omitted). In addition, the then-secretary of the National Bureau of Casualty Underwriters noted that the new "occurrence-based" policy retained the term "accident" in the definition of "occurrence" in order to "clarify the intent with respect to time of coverage and application of policy limits, particularly in situations involving a related series of events attributable to the same factor. Under such circumstances only one accident or occurrence is intended as far as the application of policy limits is concerned." *Id.* at 892 (quotation omitted).

The drafting history leaves "little doubt that the definition of 'occurrence' in the newly drafted standard form CGL policy was intended to provide coverage when damage or injury resulting from an accident or 'injurious exposure to conditions' occurs during the policy period." *Id.* The drafting history also reveals that:

> The term "accident" was left in the definition of occurrence for the purpose of circumscribing the policy limits applicable to each occurrence. The drafters did not intend to require that an "accident" in the literal sense, e.g., a sudden precipitating event, occur during the policy period in order to trigger potential coverage for ensuing damage or injury. The reference to injurious exposure to conditions resulting in bodily injury or property damage eliminates any requirement that the injury result from a sudden event.

*Id.* (quotation, brackets and ellipses omitted). Moreover, the drafting history demonstrates that "the drafters of the standard occurrence-based CGL policy . . . contemplated that the policy would afford liability coverage for all property damage or injury occurring during the policy period resulting from an accident, or from injurious exposure to conditions." *Id.*

We are persuaded by the drafting history of the standardized insurance policy language and interpretation of the policy language in *Cessna Aircraft* and *Quaker State*. We similarly find no ambiguity in the language in these three policies. They clearly provide that the occurrence of property damage during the policy period is the operative event that triggers coverage. "Occurrence" is defined in the St. Paul and Utica policies as "an accident, *including continuous or repeated exposure to conditions* which results in . . . property damage." (Emphasis added.) The St. Paul and Utica policies define "property damage" as "physical injury . . . which occurs during the policy period." Similarly, the St. Paul excess occurrence policy applies to "property damage . . . caused by an occurrence." The excess policy defines "occurrence" as "an event, *including injurious exposure to conditions,* which results during this policy period in . . . property damage." (Emphasis added.)

The language of these three policies unambiguously distinguishes between the causative event—an accident or continuous or repeated exposure to conditions—and the resulting property damage. It is the property damage that must occur during the policy period, and "which results" from the accident or "continuous or repeated exposure to conditions." Thus, the language of the three policies embodies an "injury-

in-fact" trigger, and where the alleged contamination and property damage are continuing, "injuries-in-fact" triggering coverage are also continuing. *Quaker State Minit-Lube, Inc.*, 868 F. Supp. at 1304.

Our adoption of the "injury-in-fact" trigger for the policies at issue is consistent with our holdings in *U.S. Fidelity & Guaranty Co., Inc. v. Johnson Shoes, Inc.*, 123 N.H. 148 (1983), and *Peerless Insurance Co. v. Clough*, 105 N.H. 76 (1963). While neither *Johnson Shoes* nor *Peerless* expressly adopted a trigger-of-coverage theory, they both involved questions of insurance coverage in occurrence-based policies.

In *Johnson Shoes*, the insurer denied coverage in an environmental contamination case on the ground that the policy only covered "occurrences" taking place during the policy period. *Johnson Shoes, Inc.* 123 N.H. at 153. Oil had apparently leaked from an underground storage tank and, after the policy period ended, spilled over onto neighboring property. *Id.* at 151. We noted that Johnson Shoes proved that the tank was leaking while the insurance policy was in effect. *Id.* We affirmed the trial court's ruling finding coverage without adopting a specific trigger-of-coverage legal theory. *Id.* at 153.

In *Peerless*, the insurer denied coverage for fires resulting from the insured's negligent construction of fireplaces on the ground that the negligent act, and not the fires, had to occur within the policy period for coverage to be triggered. *Peerless Insurance Co.*, 105 N.H. at 78. We disagreed and held that "the time of the occurrence resulting in the loss or damage, and not the time of the negligence, determines whether there is coverage under the policy." *Id.*

At most, *Johnson Shoes* and *Peerless* stand for the proposition that coverage can be triggered by the occurrence of property damage while the policy is in effect. Neither *Johnson Shoes* nor *Peerless* held that for coverage to be triggered under an occurrence-based policy, the wrongful act must occur within the policy period; nor did they hold that the injury must be discovered or manifest itself within the policy period. We thus conclude that under New Hampshire law, for these three policies, the trigger of coverage theory is injury-in-fact.

## II. Underwriters at Lloyd's and Century Indemnity Accident-Based Policies.

We now turn to the two accident-based policies, one issued by Underwriters at Lloyd's and one issued by Century Indemnity. The Underwriters at Lloyd's accident-based policy provides:

WE THE UNDERWRITERS hereby agree, subject to the terms, conditions and limitations hereinafter mentioned, to indemnify the Assured in respect of accidents occurring during the policy period commencing [policy commencement date] and ending [policy end date] for any and all sums which the Assured shall by law become liable to pay . . . as damages . . .
> (b) for damage to or destruction of property of others (excluding property under the Assured's care, custody or control) caused by accident, hereinafter referred to as "Property Damage",

arising out of the hazards covered by and as defined in the underlying policy/ies specified in the Schedule herein and issued by the [Primary Insurers' Names], hereinafter called the "Primary Insurers,"

. . . .

1. ACCIDENT. The word "accident" shall be understood to mean an accident or series of accidents arising out of one event or occurrence.

The Century Indemnity accident-based policy provides:

Coverage B- Property Damage Liability
> To pay on behalf of the *insured* all sums which the *insured* shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss or use thereof, caused by accident.

. . . .

> This policy applies only to accidents which occur during the policy period . . . .

■ Again, we find no ambiguity in either policy. The Underwriters at Lloyd's policy unambiguously states that it covers "accidents occurring during the policy period." Similarly, the Century Indemnity policy "applies only to accidents which occur during the policy period." Thus, the accident must occur within the policy period; the resulting damage, however, does not necessarily have to occur during the policy period.

Although we conclude that coverage is triggered under these policies when an "accident" occurs during the policy period, we disagree with Century Indemnity's assertion that the "accident" triggering coverage is limited to a "discrete causative event." Notably, neither policy specifies when an "accident" is deemed to occur.

We have previously interpreted "accident" to mean an undesigned contingency, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated and not naturally to be expected. *Vermont Mut. Ins. Co. v. Malcom*, 128 N.H. 521, 523 (1986). Because this definition does not incorporate a temporal component, the term "accident" is not as limited as Century Indemnity asserts. *See, e.g., Chemical Leaman Tank Lines v. Aetna Cas. & Sur.*, 817 F. Supp. 1136, 1147-48 (D.N.J. 1993) (holding that the term "accident" does not necessarily have a temporal component), *aff'd. in part and remanded on other grounds*, 89 F.3d 976 (3d Cir. 1996), *cert. denied*, 519 U.S. 994 (1996).

■ Moreover, in *Hudson v. Farm Family Mutual Insurance Co.*, 142 N.H. 144, 145-48 (1997), we held that injury caused by gradual and continuous exposure to electrical voltage triggered coverage under a policy covering "sudden and accidental damage" because "the term 'sudden and accidental' is . . . reasonably susceptible to an interpretation consistent with 'unexpected and unintended.'" Accordingly, the accident-based policies at issue here are triggered by "accidents" occurring within the policy period, which is not limited to a single, discrete event. We therefore conclude that, under New Hampshire law, the language of the two accident policies clearly embodies an exposure trigger, and where the alleged migration of toxic wastes is continuing, multiple exposures triggering coverage are also continuing. *Cf. Quaker State Minit-Lube, Inc.*, 868 F. Supp. at 1304 (recognizing multiple "injuries-in-fact" triggering coverage where there is continuous contamination).

*III. Underwriters at Lloyd's Occurrence-Based Policy.*

Finally, we turn to the "occurrence" policy issued by Underwriters at Lloyd's. The pertinent policy language is as follows:

> The Underwriters agree to indemnify the insured named herein and/or any associated, affiliated or subsidiary companies or corporations or interests for any and all sums which the Insured shall by law become liable to pay and shall pay or by final judgment be adjudged to pay, or which by agreement between the Insureds and the Underwriters or their representatives shall be paid to any person, firm, corporation, association, government, governmental division or governmental instrumentality . . . as *damages . . . to property* (excluding damage to property owned by the Insured) *by reason of an occurrence* resulting from or because of the Insured's business, ownership, maintenance, operation, use of or liability for properties of all kinds and nature,

or any act or omission of the Insured's agents or employees or contractors or sub-contractors it being understood and agreed that *the term "occurrence" shall mean one happening or series of happenings arising out of or due to one event.*

. . . .

This policy commences at 12.01 a.m. Standard Time [commencement date] and ends at 12.01 a.m. Standard Time [termination date] and shall apply to occurrences happening during the currency hereof.

(Emphasis added.)

EnergyNorth argues that it is the "occurrence" within the policy period that triggers coverage and, because "occurrence" is ambiguous, it could reasonably be interpreted to mean property damage or injury. Thus, EnergyNorth argues, it is the continuous property damage occurring within the policy period that triggers coverage.

Underwriters at Lloyd's argues that coverage is not triggered under this policy by damage to the property during the policy period, but rather when a discrete causative event takes place during the policy period. Underwriters at Lloyd's relies on paragraph four of the CGL insurance contract in arguing that it is the causative event that must occur within the policy period. Paragraph four provides:

This policy covers the Liability of the Insured under agreements with any person, firm, corporation, association, government, governmental division, or governmental instrumentality . . . provided always, however, that no liability shall attach to the Underwriters *by virtue of this paragraph,* in respect of any event which occurred prior to the attaching date of this policy.

(Emphasis added.) Underwriters at Lloyd's alternatively argues that, if its policy is deemed to be triggered by property damage during the policy period, then only the injury-in-fact trigger of coverage theory should be applied.

We disagree with Underwriters at Lloyd's that paragraph four limits coverage to discrete events that occur within the policy period. Even though paragraph four states that "no liability shall attach . . . in respect of any event which occurred prior to the attaching date of this policy," this paragraph is limited by its own terms to liability "by virtue of this paragraph." Because paragraph four solely concerns the scope of coverage regarding contractual liability assumed by the insured, it does not

implicate the trigger of coverage under other relevant provisions of the policy providing coverage for liability imposed by law.

Underwriters at Lloyd's points to other courts that have interpreted policy language to require the event to occur within the policy period. *See, e.g., Babcock & Wilcox Co. v. Arkwright-Boston Mfg. Mut. Ins. Co.*, 53 F.3d 762 (6th Cir. 1995). *Babcock* and the other cases relied upon by Underwriters at Lloyd's, however, have different language than the policy at issue here. For instance, the policy at issue in *Babcock* defined "occurrence" as "any happening or series of happenings, arising out of or due to one event taking place during the term of this contract." *Id.* at 766. The court found that "the policy clearly required that the 'event' must take place during the policy term." *Id.* Given the difference in policy language, the reliance of Underwriters at Lloyd's on the line of cases interpreting policies similar to the one at issue in *Babcock* is misplaced.

■ Turning to the language of the relevant provisions here, we note that the policy provides that coverage is triggered by "occurrences happening during the currency hereof." Thus, it is clear that the "occurrence" giving rise to the property damage must have taken place during the policy period; the policy, however, does not require that the resulting property damage take place during the policy period. *See Norfolk Southern Corp. v. Calif. Union Ins.*, 859 So. 2d 167, 189 (La. Ct. App.) (interpreting similar policy language), *writ denied*, 861 So. 2d 579 (La. 2003).

In holding that the "occurrence" must take place during the policy period, we must now interpret the term "occurrence." The policy defines "occurrence" as "one happening or series of happenings arising out of or due to one event." EnergyNorth argues that the term "happening" is ambiguous and could reasonably be interpreted to mean property damage. We disagree.

■ We must interpret the term "happening" consistent with its natural and ordinary meaning. *See Godbout*, 150 N.H. at 105. The natural and ordinary meaning of "happening" is something that occurs unexpectedly and without design. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1031, 1561 (unabridged ed. 2002) (defining "happening" as an occurrence; and "occurrence" as something that happens unexpectedly and without design). This definition is akin to our interpretation of the term "accident" and similarly does not incorporate a temporal component. Accordingly, the occurrence-based policy at issue is triggered by a "happening or series of happenings" within the policy period, which is not limited to a single, discrete event. We therefore conclude that, under New Hampshire law, the language of the policy clearly embodies an exposure

trigger, and where the alleged migration of toxic wastes is continuing, multiple exposures triggering coverage are also continuing. *Cf. Quaker State Minit-Lube, Inc.*, 868 F. Supp. at 1304 (recognizing multiple "injuries-in-fact" triggering coverage where there is continuous contamination).

The defendants also raise issues regarding collateral estoppel and allocation of damages. These issues are not encompassed in the certified question and, therefore, we will not address them. Accordingly, EnergyNorth's motion to strike Utica's brief, which addresses collateral estoppel, is moot.

*Remanded.*

NADEAU and DALIANIS, JJ., concurred.