452 F.3d 44
 ENERGYNORTH NATURAL GAS, INC., Successor in Interest to Gas Services, Inc., Plaintiff, Appellee,
v.
CENTURY INDEMNITY COMPANY, Successor in Interest to Cigna Specialty Insurance Co., CCI Insurance Company, Insurance Company of North America, and Indemnity Insurance Company of North America, Defendant, Appellant;
American Home Insurance Company; America Re-Insurance Company; Associated Electric and Gas Services Limited; International Insurance Company, Successor in Interest to International Surplus Lines Insurance Company; Lexington Insurance Company; North Star Reinsurance Corporation; Northwestern National Insurance Company of Milwaukee, Wisconsin, Successor in Interest to Bellefonte Insurance Company and Bellefonte Underwriters Insurance Company; The Northern Assurance Company of America; St. Paul Fire and Marine Insurance Company; Utica Mutual Insurance Company; Lloyds Underwriters at London; and National Union Fire Insurance of Pittsburgh, Defendants.
 No. 05-2149.
 United States Court of Appeals, First Circuit.
 Heard January 13, 2006.
 Decided June 28, 2006.
 
 COPYRIGHT MATERIAL OMITTED John L. Altieri, Jr., with whom Robert M. Swederlow and O'Melveny & Myers LLP were on brief, for the appellant.
 Bruce W. Felmly, with whom Michael J. Quinn and McLane, Graf, Raulerson & Middleton, P.A. were on brief, for the appellee.
 Before SELYA, LIPEZ, and HOWARD, Circuit Judges.
 LIPEZ, Circuit Judge.
 
 
 1
 EnergyNorth Natural Gas, Inc. claimed that certain Century Indemnity Company excess liability insurance policies covered EnergyNorth's potential liability for environmental contamination at the site of former utility operations in Dover, New Hampshire. After a jury trial, but before the jury was charged, the district court entered judgment as a matter of law for EnergyNorth. Century appeals, claiming that the district court erred in refusing to allow the case to go to the jury, in excluding some evidence, and in ordering Century to reimburse EnergyNorth for certain costs and fees. We affirm.
 
 I.
 
 2
 We describe some background facts, the posture of the case, and some of the evidence presented at trial, leaving other details for discussion in connection with Century's allegations of error. Because the district court granted judgment as a matter of law, we review the facts in the light most favorable to Century. Isom v. Town of Warren, 360 F.3d 7, 9 (1st Cir.2004).
 
 A. Factual Background
 
 3
 Before natural gas became widely available, utilities produced gas fuel for heating, lighting and cooking at facilities called manufactured gas plants (known in the industry as "MGPs"). New Hampshire's MGPs came into service in the 1800s. They became outmoded and were abandoned when natural gas pipelines reached the state in the 1950s. Generally, MGPs created gas by heating coal in a large oven. As the coal reached high temperatures, gas evaporated and was drawn into holding tanks, processed, purified (cleansed of tar and other contaminants), and piped out for use.
 
 
 4
 Along with gas, the MGP process produced a variety of solid and liquid byproducts, including ash, clinker, coal slag, cyanides, drip oils, and tar. Some of these byproducts are long-lasting and now contaminate the ground and water around the sites once occupied by MGPs, either because they were discharged as unwanted waste or because they seeped accidentally from the plants. Several components of MGP waste, including tar, are considered carcinogenic, and MGP sites have become significant environmental and public health concerns.[1]
 
 
 5
 An MGP operated near the tidal Cocheco River in Dover, New Hampshire from 1850 until 1956. This MGP had several owners and operators. EnergyNorth, a company of relatively recent vintage, is the successor in interest to Gas Services, Inc., which operated the Dover MGP from 1945 to 1955. The MGP was largely destroyed in 1957, but Gas Services retained some responsibility for its former site. By 1999, when the Department of Environmental Services began the proceedings that led to this litigation, it had become clear that the Dover MGP had contaminated the ground and water underneath and around the site, and the waters and bed of the Cocheco River.
 
 
 6
 At issue here is the contamination caused by tar at the Dover MGP site. A heavier-than-water liquid with approximately the consistency of vegetable oil, tar was the chief liquid byproduct of MGP gas production. It condensed and was extracted from MGP gas as it cooled. MPG producers separated tar from gas in order to make the gas suitable for consumer use. Normally, tar was either re-burned for fuel or sold as an industrial product. At nearly all MGP sites, however, at least some tar escaped confinement or was dumped into the environment. Once tar enters the environment, it tends to migrate, or flow, and to contaminate soils well beyond the original sites of MGPs. Officials found tar in the ground around the Dover MGP site, and in the bed of the Cocheco River, downhill from the site.
 
 
 7
 There is no dispute that there were additional causes of contamination at the Dover MGP site. EnergyNorth admitted, for instance, that its predecessor, Gas Services, buried ash, clinker, and purifier wastes on the MGP site. Ash and clinker were solid materials left over after the coal was heated to produce gas. Purifier wastes were highly-contaminated wood chips, used as part of a filtration process that removed cyanide and other compounds from the gas before it was piped out for use. EnergyNorth did not seek coverage from Century related to its costs for cleaning up the remnants of these disposals. EnergyNorth also admitted that Gas Services had dumped drip oils into the Cocheco River. Drip oils were lighter-than-water liquids that condensed in gas distribution pipes after the tar in the gas had been eliminated.
 
 B. Procedural Background
 
 8
 In the late 1990s, the New Hampshire Department of Environmental Services began investigating environmental contamination at the sites of former MGPs around the state. Invoking a New Hampshire statute that — the parties agree — imposed strict liability on the Dover MGP's former owners, the department sent "a letter of notification" to EnergyNorth, informing the company that the state had determined that EnergyNorth, along with other utility companies, was strictly liable for the contamination of the Cocheco River and nearby waters and soils. EnergyNorth complied with the state's order that it help study and address the contamination.
 
 
 9
 Shortly after receiving the letter of notification from the state, EnergyNorth commenced this case by suing fifteen out-of-state insurers in the federal district court, contending that it was entitled to invoke a variety of insurance policies to cover its costs in cleaning up the Cocheco. EnergyNorth also sued a sixteenth insurer in New Hampshire state court. The district court and New Hampshire state courts soon became familiar with MGP issues by handling this complex case and a variety of similar efforts relating to other MGP sites around the state. After the district court entered partial summary judgment on several issues, none of which are contested here, EnergyNorth resolved its claims against fourteen of the insurers through settlement.[2] EnergyNorth's claim against Century proceeded to trial.
 
 
 10
 Century had issued insurance policies to Gas Services providing excess liability coverage for two periods after the Dover MGP was shut down: 1960-63 and 1971-75. Even though the MGP no longer was operating during these periods, Gas Services still faced potential liability for the former MGP. In filing for a declaratory judgment, EnergyNorth sought a ruling that it could invoke the Century policies in the event that its liability exceeded the amount payable under its general liability policies for the policy periods.
 
 
 11
 Century's policies promised to reimburse Gas Services for excess liability related to "damages" from "accidents" that occurred during the policy periods.[3] Seeking to demonstrate that the environmental cleanup efforts undertaken were neither "damages" nor related to an "accident" that occurred during the policy periods, Century raised three main defenses: (1) its policies exempted conduct that was "inherently injurious" from the definition of "accident," and Gas Services had waived its right to coverage by intentionally discharging tar into the environment; (2) any accidental discharge actually responsible for the contamination at issue did not occur during the policy periods; and (3) any potential costs were due, at least in part, to preventative efforts, which could not be considered "damages" under the policies. EnergyNorth countered that (1) its predecessor Gas Services never disposed of tar intentionally; (2) environmental contamination "accidents," as defined by New Hampshire law, which occurred during Century's policy periods, contributed to the current contamination; (3) under New Hampshire law, the cleanup efforts at the Dover MGP fit the policies' coverage for "damages."
 
 
 12
 When the holder of a liability insurance contract seeks a declaratory judgment under New Hampshire law that "an existing insurance contract covers the particular incident in question," Hodge v. Allstate Ins. Co., 130 N.H. 743, 546 A.2d 1078, 1081 (1988), the insurer bears "the burden of proof concerning the coverage." N.H.Rev.Stat. Ann. § 491:22-a (providing that an insured may seek a declaratory judgment that its insurance policy covers a certain claim). Although EnergyNorth initiated this suit, it was Century's burden to show why its policies could not be invoked.[4]
 
 
 13
 C. The Trial and Judgment as a Matter of Law
 
 
 14
 At trial, EnergyNorth presented both expert and lay testimony to contradict Century's intentional discharge defense. EnergyNorth's MGP expert opined that the tar responsible for most of the contamination at issue had seeped from one area of the MGP site, downhill, into the subsoil, groundwater, and Cocheco River. EnergyNorth's lay witnesses on the intentional discharge issue, who had observed the MGP in operation, testified that Gas Services had not discharged tar intentionally, but rather had collected and sold that byproduct. As we already have noted, EnergyNorth's witnesses admitted that Gas Services had buried solid waste — ash and clinker — on the Dover site and had dumped "drip oils" — another MGP byproduct-into the Cocheco. But EnergyNorth's expert testified that the relevant remedial efforts had not been connected to any pollution from solid waste or drip oils. The expert also testified that MGP operating practices had changed by the time Gas Services arrived at the MGP site. In the early years of MGP operation, he said, it was common for operators to dispose of tarry wastes onsite, perhaps by burying tar along with ash and clinker. By the time Gas Services operated the MGP, however, the norm was for all available tar to be sold and transported offsite. While ash and clinker still were disposed on site, these materials no longer were mixed with tar before they were buried.
 
 
 15
 On the issue of whether any contamination was traceable to the policy periods, EnergyNorth's expert testified that tar seepage had occurred continually, including during the policy periods, even long after the facility was abandoned. On the issue of preventative versus remedial efforts, EnergyNorth presented expert and lay testimony from people familiar with the cleanup. They testified that all of the efforts undertaken were required by law and were aimed at cleaning up preexisting contamination, rather than at preventing further contamination.
 
 
 16
 Century prepared an MGP expert but, for reasons not relevant here, declined to call him at trial. As the district court later observed, Century's lack of an MGP expert prevented the insurer from introducing its own evidence about Gas Services's operation of the MGP. EnergyNorth's expert testimony about the manner in which Gas Services operated the MGP went unrebutted.
 
 
 17
 Without an MGP expert, Century tried to create a case for intentional discharge by Gas Services by working backwards from the contamination in the river. The insurer presented testimony from a hydrogeologist, who opined that tar could not have migrated to the river from the holding tank as EnergyNorth's expert had theorized. The hydrogeologist testified that the relevant tar had migrated to the river in two ways that suggested intentional disposal. He said that the tar had entered the river through a large city sewer pipe — where it might have been flushed intentionally — and by seeping from pits where it had been dumped with ash and clinker, two other MGP byproducts not responsible for the contamination at issue in this case, that commonly were disposed on the MGP site.
 
 
 18
 Primarily through cross examination of Century's experts, EnergyNorth sought to establish that Century had no evidence that Gas Services had intentionally deposited tar on the MGP site. Instead, Century's evidence of intentional disposal only inculpated parties that had operated the MGP before Gas Services.
 
 
 19
 After Century completed its case, on the fifth day of trial, EnergyNorth moved for judgment as a matter of law. Fed. R.Civ.P. 50(a). The district court granted the motion in part, ruling that Century had failed to present any evidence that Gas Services had intentionally discharged tar into the environment during the ten years that Gas Services had run the plant. The district court allowed the case to proceed on certain other issues, including Century's theory that EnergyNorth's costs were preventative in part — meaning that they were not covered by the relevant insurance policies. EnergyNorth presented rebuttal witnesses on these issues, including a geologist with expertise in environmental cleanup efforts. Century declined an invitation to present sur-rebuttal witnesses. The district court then took EnergyNorth's renewed Rule 50(a) motion under advisement. The next day, before the case went to the jury, the district court entered judgment in full for EnergyNorth, concluding that the evidence only permitted the conclusion that EnergyNorth's expenses were entirely "remedial," as that term has been defined by the New Hampshire Supreme Court, and hence covered by the damages provision of the Century policies.
 
 
 20
 Acting on EnergyNorth's motion, the district court later concluded that Century should reimburse EnergyNorth for $756,534 in litigation expenses. While the parties had stipulated conditionally to the dollar amount reasonably supported by documentation, Century had contended that the district court should not require it to pay the full amount of costs and fees that were also attributable to EnergyNorth's efforts against Century's former co-defendants. The district court concluded that, under New Hampshire law, EnergyNorth was entitled to reimbursement of all costs and fees necessary to prevail against Century.
 
 II.
 
 21
 Century now alleges three errors. It claims (A) that the district court should not have taken the case from the jury, (B) that the district court abused its discretion by excluding evidence of a wooden pipe connecting the Dover MGP to the city sewer system, and (C) that the district court misconstrued New Hampshire law in calculating the cost and fee award. We address these contentions in turn.
 
 A. Judgment as a Matter of Law
 
 22
 Criticizing what it contends was a "highly disfavored" course, Century argues that the district court ignored evidence in its favor in granting EnergyNorth's Rule 50(a) motion. Century claims that the evidence created three issues of fact for the jury: whether Gas Services had intentionally dumped tar into the environment, whether any insurable event had occurred during either of the policy periods, and whether Century had been asked to reimburse EnergyNorth for preventative measures.
 
 
 23
 The Supreme Court emphasized recently that district courts are "if anything, encouraged" to postpone ruling on a motion for judgment as a matter of law until after the jury has returned a verdict and the motion has been reiterated pursuant to Rule 50(b). Unitherm Food Sys. Inc. v. Swift-Eckrich, Inc., ___ U.S. ___, ___, 126 S.Ct. 980, 988, 163 L.Ed.2d 974 (2006). But a district court "is permitted" to grant a Rule 50(a) motion, before the case goes to the jury, when "it concludes the evidence is legally insufficient." Id. Under the familiar standard, judgment as a matter of law is appropriate when the evidence "would not permit a reasonable jury to find in favor of [the nonmoving party] on any permissible claim or theory." Espada v. Lugo, 312 F.3d 1, 2 (1st Cir. 2002) (internal quotation marks omitted). We review the grant of a Rule 50(a) motion de novo. See Burton v. Town of Littleton, 426 F.3d 9, 14 (1st Cir.2005).
 
 1. Intentional Discharge of Tar
 
 24
 Century argued at trial that Gas Services intentionally discharged tar into the environment. If this is true, the parties agree, Century's policies would not apply, for they extended no coverage for Gas Services's "inherently injurious" conduct. See EnergyNorth Natural Gas, Inc. v. Continental Ins. Co., 146 N.H. 156, 781 A.2d 969, 973 (2001). An intentional discharge would be "inherently injurious." Century claims that the evidence permitted the jury to find that Gas Services piped tar into the Cocheco River through the city sewer system, that Gas Services buried tar on its property when it disposed of ash and clinker, and that the company put tar directly into the river when it dumped drip oils there. The evidence allowed none of these findings.
 
 
 25
 Viewing the record in the light most favorable to Century, we can accept that the insurer presented evidence that at some point tar entered the river through two pipes, a 48-inch sewer pipe that ran past the MGP and an eight-inch pipe that once connected the drain in an MGP building to the river. Century's hydrogeologist linked the pattern of tar deposits in the river to the pipes. Moreover, the hydrogeologist cast doubt on EnergyNorth's theory that tar had seeped from the MGP into the ground and then slowly migrated downhill, toward the river. Though his opinions on these points were disputed by EnergyNorth, we also accept them for the purposes of this appeal. This evidence plausibly created an issue of fact as to whether some operator of the MGP intentionally discharged tar, through the pipes, into the river.
 
 
 26
 But Century conspicuously failed to present any evidence that tar had been discharged intentionally into the two pipes during the ten years in which Gas Services operated the MGP. EnergyNorth, meanwhile, presented evidence that traditional MGP practices — such as discharging tar as a waste product — had evolved by 1945, when Gas Services took control of the Dover plant. EnergyNorth's MGP expert and lay witnesses, who were familiar with the operation of the plant, bolstered EnergyNorth's theory that Gas Services never had discharged tar intentionally, but rather made a practice of carefully collecting the byproduct so that it could be sold. In the end, Century had produced evidence that contamination had entered the river through the two pipes, but had done nothing to controvert EnergyNorth's evidence that Gas Services had not intentionally discharged tar into those pipes.
 
 
 27
 Century's evidence of intentional burying of tar suffered from a similar problem. Through the hydrogeologist, Century produced evidence that tar had seeped into the river from pits where it had been buried with ash and clinker. Century also prodded EnergyNorth's witnesses to admit that Gas Services had continued the longstanding practice of burying ash and clinker on the MGP site. Century now contends that this evidence allowed a finding that Gas Services "intentionally dumped tar on the site by mixing it with solid waste." To the contrary, Century's evidence only allowed a finding that someone "intentionally dumped tar on the site by mixing it with solid waste" sometime during the 106 years the MGP operated. In the face of EnergyNorth's uncontested evidence that Gas Services had not mixed tar with solid wastes or buried tar on the MGP site, Century's evidence did not create an issue for the jury.
 
 
 28
 For its final theory of intentional discharge, Century argues that Gas Services had put tar into the river when it dumped drip oils there. EnergyNorth's witnesses admitted that Gas Services had disposed of drip oils by trucking them to the river and discharging them on its banks. On the basis of this admission, Century attempted to establish an inference that tar had been bound up with the dumped drip oils and that, after the dumping, the tar had separated from the drip oils and contaminated the river. Citing its counsel's cross examination of EnergyNorth's MGP expert, Century now argues that "the question of whether drip oils contributed to contamination was disputed at trial."
 
 
 29
 That expert's testimony, however, created no such question. Century did elicit testimony that the MGP "drip oils" could in some circumstances contain "tar constituents." But EnergyNorth's expert rebuffed Century's attempt to provoke an admission that the tar contamination at issue in this case could have originated from drip oils. Indeed, on redirect, the expert clarified that the contamination in the river had been analyzed and subjected to chemical "fingerprinting analysis" — or chromatography — that was inconsistent with any suggestion that the tar at issue was deposited with drip oils.[5] Century points to no contrary evidence.
 
 
 30
 2. Potential Liability Traceable to the Policy Periods
 
 
 31
 Century argues that the tar contamination at issue "was not caused by an accident that occurred during Century's policy periods." Century says that the evidence at trial supported this theory in two separate ways. First, because the Dover MGP was demolished in 1957, Century contends that any accidental discharge of tar occurred before the first policy period began, in 1960. Second, because the tar then in the Cocheco River was removed in a 1986 dredging, Century contends that all of the contamination at issue now must have occurred after the second policy period ended, in 1975. These arguments are unpersuasive.
 
 
 32
 In a case involving these same parties, the New Hampshire Supreme Court analyzed the insurance polices at issue here. See EnergyNorth Natural Gas, Inc. v. Underwriters at Lloyd's, 150 N.H. 828, 848 A.2d 715 (2004). The Underwriters court explicitly disapproved of Century's first theory, stating: "we disagree with Century Indemnity's assertion that the `accident' triggering coverage is limited to a `discrete causative event.'" Id. at 723. Rather, an `accident' under Century's policy can mean a "gradual and continuous exposure" to contaminants. Accordingly, "where the alleged migration of toxic wastes is continuing, multiple exposures triggering coverage are also continuing." Id. In light of this analysis, Century cannot evade responsibility because the MGP was demolished before its policy periods began. As long as "alleged migration of toxic wastes" from the former MGP continued into the policy periods — and everyone agrees that it did — Century's policies were triggered.[6]
 
 
 33
 The "exposure" test adopted by the New Hampshire Supreme Court in Underwriters also disposes of Century's second argument. Even assuming that the 1986 dredging eliminated all of the tar that had reached the river by that point, there was no evidence that all the tar that had migrated during Century's policy periods had reached the river by 1986. To the contrary, EnergyNorth's experts gave unrebutted testimony that the tar that had entered the riverbed since 1986 "had been migrating from [the MGP site] during the period of time that also covers the 1960s and 1970s." In other words, Century did not contradict EnergyNorth's evidence that the relevant contamination was linked to the "migration of toxic wastes" during Century's policy periods. Underwriters, 848 A.2d at 723. Clearly, under the reasoning articulated in Underwriters, Century's policies were triggered.
 
 3. Remedial Versus Preventative Efforts
 
 34
 Century argued at trial, and continues to argue on appeal, that the evidence permitted a finding that a portion of the work at the Dover site had been to "prevent future pollution or contamination," and hence did not fall within the damages provision of its insurance policies. In particular, Century objects to the erection of a steel "barrier wall" (200 feet long and 40 feet deep) between the MGP site and the river, and to the construction of "soil caps" around some of the most contaminated areas of the former MGP site.[7]
 
 
 35
 Before we analyze Century's argument, we must explain the mechanisms of tar contamination at the Dover MGP site.[8] Tar is a liquid and, like water, can penetrate some soil layers. When tar is released near ground level, it may sink into the ground. However, tar in the ground does not simply disappear. When subsurface tar comes up against a layer of soil or rock that it cannot permeate, it pools underground or, if conditions are right, flows downhill along the surface of the impermeable layer. Because tar is denser than water, and non-soluble, it can sit underneath a body of groundwater or surface water.
 
 
 36
 Either migrating through the soil or pooled underground, tar constitutes a public health hazard and a source of environmental contamination. When tar comes into contact with ground or river water, "there is a dissolution process," by which the water picks up hazardous contaminants from the tar. Groundwater that comes into contact with tar is spoiled as a source of drinking water. River water that comes into contact with tar deteriorates in quality as well. When tar contaminates a riverbed, it can adversely affect aquatic life. When tar, or tar-contaminated soil and water, exists in an inhabited area, it is a human health hazard.
 
 
 37
 The Dover MGP sat on a hill overlooking the river. At the time that the state ordered a cleanup, tar was pooled in certain areas at the top of the hill, around the sites of former MGP buildings. Tar also was flowing downhill, in a broad band along impermeable soils, covering an entire stretch of the strip of land between the MGP and the river, and also extending underneath the river itself. Groundwater came into contact with the tar and became contaminated. Water in the river also came into contact with the tar. Indeed, because the river was tidal by the MGP site, it constantly stirred up the sediments in the riverbed, accentuating the ability of the tar to contaminate the river water. In addition, people in the community came into contact with tar-contaminated water and soil, on the strip of land between the MGP and the river and along the river itself.
 
 
 38
 In consultation with retained experts and after lengthy negotiations with state authorities, the utility companies responsible for the Dover MGP site adopted a plan to remove as much tar as possible. The tar that could not be removed would be contained on site by isolating it, insofar as possible, from groundwater. The "barrier wall," literally an impermeable metal wall buried into the ground, was used as a tar-removal device. It was constructed across the band of migrating tar that flowed downhill from the MGP site to the riverbed, forcing the migrating tar to collect in a location from which it could be removed. The barrier wall also would keep tar from migrating to the riverbed. It was important that the tar be contained, prior to its removal, uphill from the riverbed, because the tar in the riverbed was to be removed by dredging. Obviously, if further tar migration was not contained uphill from the riverbed, tar would re-contaminate the riverbed after the dredging. The "soil caps," literally "pavement," were an effort to contain on-site the tar that existed in pools on the top of the hill. This tar had settled in a place from which it could not practicably be removed. The soil caps functioned to isolate the pooled tar from groundwater. While tar would remain underneath the soil caps, its interaction with groundwater would be stymied, and the groundwater would improve in quality.
 
 
 39
 Century draws its argument that the barrier wall and soil caps were not reimbursable under its policies from the New Hampshire Supreme Court's decision in Coakley v. Maine Bonding & Cas. Co., 136 N.H. 402, 618 A.2d 777 (1992). In Coakley, an insurer argued that its coverage for "damages" did not indemnify a landfill operator for costs resulting from an EPA-ordered cleanup. The Coakley court, which was not presented with a fully developed record, announced only general principles of reimbursement, leaving resolution of the specifics to the trial court. Id. at 787-88. Likely due to the incomplete record, Coakley does not contain detailed facts about the pollution control measures at issue. The Coakley court did reveal that hazardous wastes released by the landfill operator had contaminated groundwater belonging to the state and that the EPA had ordered measures including "`collection and treatment of groundwater to remove and prevent further migration of contaminants,'" and "`placing a cap over the landfill to minimize the migration of contaminants from the landfill.'" Id. at 780.
 
 
 40
 The Coakley court held that "remedial response costs imposed by [environmental protection agencies] are damages for purposes of coverage under [] comprehensive general liability and excess liability policies." Id. at 787. The court reasoned that removing contaminants from the groundwater was a way for the landfill operator to "make up, or make good," for the damages they had caused to the groundwater. Id. at 785. Put another way, there was coverage under the policies to remove contaminants when "[t]he damage has already been done." Id. at 783. This result was in accord with the majority view. See Morton Int'l, Inc. v. General Acc. Ins. Co. of Am., 134 N.J. 1, 629 A.2d 831, 845 (1993) ("The clear weight of authority [] among both federal and state courts adopts the view that the undefined term `damages' in CGL policies should be accorded its plain, non-technical meaning, thereby encompassing response costs imposed to remediate environmental damage.").
 
 
 41
 However, also in accord with the majority view, the Coakley court cautioned that purely "preventative" measures mandated by the government to prevent future releases of hazardous waste are not covered by general liability policies. Drawing on this caution, but without making a case-specific holding, the court suggested that the costs of installing a "cap" at the landfill site at issue might not be considered "damages." Coakley, 618 A.2d at 785. The landfill operator would not be able to recover the costs for the "cap" if the cap was "not compensation or satisfaction imposed by law for a wrong or injury caused by violation of a legal right." Id. (internal quotation marks omitted). The court noted that it appeared from the limited record that "the hazardous waste sought to be contained in the landfill [under the cap] has not yet injured the groundwater."[9] Id.
 
 
 42
 We are bound by the distinction drawn in Coakley between "remedial" and "preventative" measures. But we also are bound to respect the Coakley court's caution that it had provided only general definitions of "remedial" and "preventative," not a fully-precedential holding on developed facts that permits easy analogies from case to case. Here, we do have a fully developed record. Our task, like the task of the district court, is to make our best judgment about how the New Hampshire Supreme Court would apply the principles of Coakley to the facts before us. See, e.g., Hardy v. Loon Mountain Recreation Corp., 276 F.3d 18, 20 (1st Cir.2002)(recognizing that the court of appeals, sitting in diversity, may need to predict how a state court would resolve an issue).
 
 
 43
 We agree with the district court that the New Hampshire Supreme Court would deem all of the response costs in this case "remedial." Contrary to Century's position, the barrier wall and soil caps in this case are not the kind of "preventative" measures that the Coakley court suggested might be exempt from coverage. Unlike the landfill in Coakley, the Dover MGP had been out of operation for nearly a half century when the environmental enforcement began. Furthermore, the costs in this case were incurred after the tar had already damaged the environment. More specifically, the costs were incurred both to remove the taint of past contamination and to prevent future damage from that same contamination.
 
 
 44
 This last point reflects an important fact: the distinction between "remedial" and "preventative" costs cannot always be neatly drawn. Century would have us draw the line between "remedial" and "preventative" in an illogical place. As the trial record shows, there was no way that the Dover cleanup could have had the desired "remedial" effect if the barrier wall and soil caps — or other measures filling the same role — were not employed. The evidence was undisputed that the tar was already continuously coming into contact with groundwater and other environmental resources, polluting them constantly. The only way to remediate the damage was to remove or isolate the tar. If no barrier had been installed to keep the migrating tar out of the river, the river would have been contaminated again immediately after it was dredged. If no measures had been taken to isolate the tar at the top of the hill from the groundwater, and the groundwater merely was filtered to remove contaminants, the groundwater would have been recontaminated immediately by the tar in the ground. Century does not disagree with these observations. Notably, Century also appears to agree that removing the tar from the ground and the riverbed was "remedial," as that term was understood in Coakley. We can think of no reasoned distinction that would make it "remedial" to excavate immediately all of the tar from the ground and riverbed, but "preventative" to accomplish the same goal through the simpler and less costly measures that the state and utilities adopted.
 
 
 45
 In other jurisdictions that have elaborated on the distinction identified in Coakley, environmental cleanup measures that serve preventative ends while remediating the taint of prior environmental contamination have been held to be covered by general liability policies. In a case cited by the Coakley court, perhaps as a basis for the "remedial" / "preventative" distinction it sketched, the California Supreme Court explained that, while an insurance policy for "damages" does not reimburse the holder for "purely prophylactic measures designed to prevent future discharges of hazardous waste," such a policy does cover "mitigative" efforts "to prevent damage previously confined to the insured's property from spreading to government or third-party property." AIU Ins. Co. v. Superior Court, 51 Cal.3d 807, 274 Cal. Rptr. 820, 799 P.2d 1253, 1272 (1990). Courts in other jurisdictions consistently have reached similar results. See, e.g., Aetna Cas. & Sur. Co. v. Commonwealth, 179 S.W.3d 830, 838-39 (Ky.2005) (holding that "damages" encompasses environmental response costs to "rectify, control, lessen or stop ongoing injury"); Johnson Controls, Inc. v. Employers Ins. of Wausau, 264 Wis.2d 60, 665 N.W.2d 257, 274 (2003) ("It is true that the protection of human health and welfare is a future benefit from remediating damaged property. However, shifting the focus from remediating past injury to preventing future injury from contamination does not change the remedial nature of CERCLA response costs for completed past actions."). Here, the discharges of tar into the environment by EnergyNorth's predecessors were "completed past actions." To the extent that there is any clear line between remedial and preventative response costs, this line seems to be drawn between actions taken in relation to releases of hazardous waste that already have occurred and measures taken in anticipation of releases that may occur in the future. See Boeing v. Aetna Cas. & Sur. Co., 113 Wash.2d 869, 784 P.2d 507, 516 (1990) ("[R]emedial measures [are] taken after pollution has occurred. . . preventative measures [are] taken before pollution has occurred."). Here there is no dispute that all of the discharges of tar happened long ago. Nothing done in Dover was an effort to prevent a future discharge of hazardous waste.
 
 
 46
 Century places great weight on evidence that certain of the environmental experts who were consulted about cleaning up the Dover MGP site originally preferred a remedial plan that would not have included the barrier wall. (The state authorities later agreed that a plan including the barrier wall would be a better approach.) Century also points to evidence that the environmental cleanup team originally suggested an alternative approach that would not have included the wall as a "physical barrier" but would have used wells and pumps to create a "hydraulic barrier" to prevent tar from migrating into the river and to allow it to be collected. This evidence does not help Century. The existence of alternative cleanup approaches, which eventually were rejected because they would have taken too long and posed an unnecessary risk of leakage and future contamination, does not change the barrier wall and soil caps from remedial into preventative mechanisms, as those terms are described under New Hampshire law. Again, the district court got it right.
 
 B. Evidentiary Issues
 
 47
 Century contends that the district court erred by preventing the jury from learning that a wooden pipe or trough had connected the MGP to the city sewer system and the river. In Century's view, this evidence bolstered its theory that the MGP's operators had discharged tar intentionally. Taking a different view, the district court refused to allow Century to play a video recorded during the cleanup process that depicted workers uncovering the trough and discovering a tarry substance in it. The court explained that Century had failed to disclose that its experts would testify as to the wooden trough, and the jury would not be able to understand the videotape without an expert's guidance. Essentially for the same reasons, the court also prohibited Century's witnesses from mentioning the wooden trough and rebuffed Century's efforts to have one of the workers who was present when the trough was uncovered describe what he had seen.
 
 
 48
 We do not doubt that the district court's rulings were permissible on the grounds stated. We need not evaluate those grounds, however, because it is obvious that no evidence pertaining to the wooden trough could have changed the outcome of the case. The trough, and any lay or expert testimony relating to it, was additional evidence that some operator of the MGP had discharged tar into the river. But Century does not suggest that it had any evidence linking the trough to Gas Services (rather than to a previous operator). To the contrary, the trough appears to have been of antique vintage, which merely reinforces its lack of connection to Gas Services. Even if evidence relating to the trough had been admitted, there would not have been an issue for the jury.
 
 C. Costs and Fees
 
 49
 EnergyNorth's right to costs and fees stems from N.H.Rev.Stat. Ann. § 491:22-b, which provides that "if the insured prevails" in an action for a declaratory judgment against an insurer "he shall receive court costs and reasonable attorneys' fees from the insurer." In calculating its bill of costs and fees EnergyNorth included pretrial and trial expenses. Since the action against all sixteen insurers was litigated in concert (fifteen in federal court and one in state court), EnergyNorth argues that Century is responsible for many costs related simultaneously to Century and to other insurers that settled before trial. Century argues that it should have to pay only the costs related to the trial and one-sixteenth of the pretrial costs that pertained to all of the defendants.
 
 
 50
 Century is especially critical of the district court's decision to award costs and fees related to EnergyNorth's discovery expenses in the related state court case to which Century was not a party. As already noted, one of the sixteen insurers EnergyNorth sued was a New Hampshire company, Home Insurance Co. (EnergyNorth's case against Home Insurance ended before trial.) The issues in the state court case were the same as in this case, the cases were litigated in concert, and the parties, including Century, agreed that there was no need to conduct duplicate discovery where the evidence material to one case also was material for the other. In the end, EnergyNorth billed Century for approximately $21,000 in expenses originally incurred in connection with the Home Insurance case. Most or all of this amount was attributable to the depositions of the experts who later appeared at the trial in this case. Accordingly, the district court held that EnergyNorth could ask Century to pay for "the shared discovery conducted in the related state court case," with the proviso that the utility was "not entitled to a double recovery."
 
 
 51
 Century's argument begins with a valid point about the duty to "segregate" costs and fees. Many statutes award costs and fees to successful litigants as a matter of right. If a litigant under such a statute is successful against two or more parties, but only one of the opposing parties insisted on a trial, the opposing parties that settled may not be required to pay costs and fees. In such a case, the party that lost at trial should be responsible only for the costs and fees related to it. The fees related only to the settling parties should be segregated. See, e.g., Stewart Title Guar. Co. v. Sterling, 822 S.W.2d 1, 10-11 (Tex.1991) ("[T]he plaintiff must segregate the fees owed by the remaining defendants so that the remaining defendants are not charged fees for which they are not responsible.").
 
 
 52
 But Century ignores the exception to this rule: the duty to segregate fees does not apply to costs and fees spent in connection with efforts so interrelated to all of the settling and non-settling parties that segregation would be impossible. As the Texas Supreme Court has stated, "A recognized exception to [the] duty to segregate arises when the attorney's fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts." Id. at 11 (internal quotation marks omitted); see also DeSpiegelaere v. Killion, 24 Kan.App.2d 542, 947 P.2d 1039, 1043 (1997) ("Stewart is fully representative of the case law on this issue."); Reynolds Metals Co. v. Alperson 25 Cal.3d 124, 158 Cal.Rptr. 1, 599 P.2d 83, 86 (1979) ("Attorney's fees need not be apportioned when incurred for representation of an issue common to both a cause of action in which fees are proper and one in which they are not allowed.").
 
 
 53
 In other words, under this exception, if the outcome of a sixteen-defendant case depends on the resolution of certain common issues, and those common issues require certain common costs (which will have to be incurred whether there is one defendant or sixteen), the successful plaintiff may, if the district court deems it reasonable, recover all of those common costs, even if fifteen of the sixteen defendants settle before trial. See Diamond v. John Martin Co., 753 F.2d 1465, 1467 (9th Cir.1985) (applying California law) ("[J]oinder should not dilute the right to attorneys' fees.").
 
 
 54
 We have reached a similar result in cases where a party entitled to attorneys' fees prevails on some claims but not on other factually "interrelated" claims. In these cases, "if the fee-seeker properly documents her claim and plausibly asserts that the time cannot be allocated between successful and unsuccessful claims, it becomes the fee-target's burden to show a basis for segregability." Lipsett v. Blanco, 975 F.2d 934, 941 (1st Cir.1992); see also Aubin v. Fudala, 821 F.2d 45, 47 (1st Cir.1987) (Breyer, J.) (concluding that the district court acted within its discretion in not requiring "further parsing" in such a case).
 
 
 55
 Century urges that it is "grossly unfair" for it to bear the entire cost of EnergyNorth's efforts. We disagree. Century does not suggest that EnergyNorth's claims against Century could have been litigated for a penny less than the district court's award, even if Century had been the only defendant in the case all along. Indeed, Century stipulated that the submitted fees represented a reasonable expenditure for the litigated issues, an admission both that the costs and fees for which EnergyNorth sought reimbursement fell into the exception to the duty to segregate described in Stewart and Reynolds Metals, and that the costs were far from "grossly unfair." Century's fairness argument is further undermined by the district court's clear warning that Century risked a high liability in fees and costs if it chose to go to trial despite the agreement by the other defendants to settle. Indeed, the court warned that such liability might far exceed the amount EnergyNorth had demanded to settle the case. Of course, Century was entitled to demand a trial; but it had to accept the consequences of its choice.
 
 
 56
 We do not think that it makes any difference that a small portion of EnergyNorth's efforts were undertaken in the closely-related state court case. If Century had been the only defendant, EnergyNorth would have incurred the same fees in federal court. The parties, including Century, agreed not to duplicate the state court fees, so that everyone involved could save the expense involved in doing so. See Bianco, P.A. v. Home Ins. Co., 147 N.H. 249, 786 A.2d 829, 833 (2001) (favoring a construction of § 491:22-b that avoided any incentive for duplicative legal expenditures). Notably, Century does not suggest that EnergyNorth could have done more to segregate the submitted portion of the state court fees.
 
 
 57
 In summary, considering the well-established exception to the duty to segregate fees, we conclude that Century cannot ask EnergyNorth to reduce its request for costs and fees when all of those costs and fees were necessary for EnergyNorth to prevail against Century at trial and, indeed, would have been necessary even if Century had been the only defendant all along. The district court did not abuse its discretion on this issue.
 
 
 58
 
 Affirmed.
 
 
 
 
 Notes:
 
 
 [1]
 For more information on the health hazards associated with MGP sites,see, e.g., Wisconsin Division of Public Health, "Human Health Hazards: Former Manufactured Gas Plants," at http://www.dhfs.state.wi.us/eh/ HlthHaz/pdf/MGP.pdf (last visited June 15, 2006).
 
 
 [2]
 The case against the fifteenth insurer ended with that insurer's liquidation
 
 
 [3]
 Century's excess liability policies did not contain a duty to defend
 
 
 [4]
 The New Hampshire law of evidentiary burdens governedSee Dichner v. Liberty Travel, 141 F.3d 24, 33 (1st Cir.1998) (recognizing that in a diversity case state law dictates who bears the burden of proof).
 
 
 [5]
 The MGP expert testified that drip oils, as the term was used at trial, are composed of low-boiling-point hydrocarbons that condensed at a late stage in the MGP process. The tar in the Cocheco River, he explained, was composed of high-boiling-point hydrocarbons that developed earlier in the process
 
 
 [6]
 Under New Hampshire's strict liability environmental cleanup regime, it was immaterial that an operator of the MGP previous to Gas Services had discharged the relevant tar into the environment. EnergyNorth was liable as a property owner, and Century's policies provided excess coverage for that liability
 
 
 [7]
 Century also includes a one-sentence objection to the "proposed river dredge" of the Cocheco River bed. The objection appears to be that the proposed dredging was unnecessary, not that it was preventative. We deem this objection waived for lack of appellate argumentSee Baybank-Middlesex v. Ralar Distributors, Inc., 69 F.3d 1200, 1204 (1st Cir.1995) (requiring that appellate arguments be presented "squarely and distinctly" (internal quotation marks omitted)).
 
 
 [8]
 We draw the relevant facts largely from the testimony of Muriel Robinette, a geologist and engineer employed in the Dover MGP cleanup effort. Her testimony at trial went unrebutted
 
 
 [9]
 This appears to be the statement upon which Century relies in urging that the barrier wall and soil caps were preventative rather than remedial measures. We note two problems with this reliance. First, Century overlooks the New Hampshire Supreme Court's explicit disclaimer that it had not finally decided the status of the landfill cap:
 Although it appears from the record before us that certain costs, such as the cost of constructing a containment cap, do not fall within the definition of "damages," while other costs do, we recognize that these issues were not directly argued or decided in the superior court. Given the procedural posture of this case, we do not here finally determine whether any particular cost constitutes "damages" as we have defined them in this opinion; we leave such disputes to be resolved in the first instance by the superior court.
 Coakley, 618 A.2d at 787-88. Second, there may be good reason to question the scientific validity of the assumption in Coakley that the hazardous waste in the landfill was not already damaging the environment, even if it had not yet contaminated the groundwater. On a fully developed record, the New Hampshire Supreme Court might well have concluded that the landfill cap actually was "remedial."